NAYADE, The (INGRAHAM v.). See Case No. 7,046.

## Case No. 10,061.

### NAYLOR et al. v. BALTZELL et al.

#### [Taney, 55.] [1]

Circuit Court, D. Maryland. Nov. Term, 1841.

CARRIERS—CONTRACT—LEX CONTRACTUS—BILL OF LADING—SHIPPING—POWER OF MASTER TO BIND—BOTTOMRY BOND—SALE OF CARGO.

1. The ancient common law in relation to carriers is, undoubtedly, in force in Maryland, but there is no principle of jurisprudence upon which the court can expound a contract by the laws of that state, if it was not made there, nor was any part of it to be performed there.

2. The law of the domicil of the party does not govern the contract, nor determine his rights or obligation; they depend upon the law of the place where it was made, or where it was to be executed.

[Cited in Balfour v. Wilkins, Case No. 807.]
[Cited in Snashall v. Metropolitan R. Co., 19 D. C. 400. Cited in brief in Talbott v. Merchants' Despatch Transportation Co., 41 Iowa, 248.]

3. The master has a right to contract for the employment of the vessel, under circumstances of necessity, and the owners will be bound by it; but this right is derived from the maritime code, which is founded on the general usages and convenience of trade, and which has been adopted, to a certain extent, by all commercial nations.

[Cited in The Ole Oleson, 20 Fed. 387.]

4. The bill of lading is an instrument founded in the usages of trade, and not connected with any of the peculiar doctrines of the common law.

5. Where a vessel is injured by dangers of the seas, and is obliged to seek a port of distress, where she is found to be unable to proceed on her voyage, and the cargo is landed, the master becomes the agent of the cargo as well as the ship, and in that character, it is his duty to deal with the cargo, as a prudent and discreet owner would have done, if he had been on the spot at the time. He may transship it, and earn freight for his owners. If his own ship can be repaired in a reasonable time, he has a right to retain it until his own ship is ready, and, if necessary, may sell a part of the cargo, or hypothecate the whole, in order to obtain money for the necessary expenses of repairs; or he may abandon the voyage, and notify the owners of the cargo, of the disaster, and await their orders as to its future disposition.

6. As to the ship, the master may, in a foreign port, contract for repairs and supplies, and thereby bind the owners to the value of the ship and freight; or he may hypothecate the ship and freight, and thereby create a direct lien upon them for the security.

7. The authority of the master is limited to objects connected with the voyage, and if he transcends the prescribed limits, his acts become, in legal contemplation, mere nullities: and it is incumbent on the creditor to prove the actual existence of the necessity of those things which give rise to his demand.

8. The owners are not personally responsible for debts contracted by the master for repairs, beyond the value of the ship and freight.

[Cited in Force v. Providence Washington Ins. Co., 35 Fed. 778; The Scotia, Id. 912.]

9. Nor can any terms inserted in a bottomry-bond, by the master, make them responsible for a greater amount.

10. A bottomry-bond executed by the master, hypothecating as well the cargo as the ship and freight, will not render the owners of the ship

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

personally responsible to the owners of the cargo, beyond the value of the ship and freight.

[Cited in Miller v. O'Brien, 35 Fed. 782.]

11. The master has the power to pledge the ship and freight, only in cases of necessity—that is to say, where it is necessary for the interest of the owner, or there is reasonable ground to believe it will be for his interest; and the lender on bottomry is bound to show the existence of this necessity, otherwise, he is not entitled to recover, even against the ship and freight.

[Cited in The Scotia, 35 Fed. 912.]

12. And because it may sometimes be for the interest of the cargo to have the vessel repaired, the power is given to the master to sell a part, or hypothecate the whole, if necessary, to raise funds for that purpose; but the lender must show that the necessity existed, otherwise, he is not entitled to recover on his bond.

13. If the owner of the cargo stands by and suffers the cargo to be sold under the bottomry-bond, without requiring evidence of the necessity for the repairs, it will not avail him, in an action against the ship owners, to show that the necessity did not exist.

[14. Cited in brief in Talbott v. Merchants' Despatch Transportation Co., 41 Iowa, 249, to the point that a contract of affreightment is performed by delivery of the goods at the point of destination.]

[This was a suit by Jeremiah T. Naylor and others against Thomas Baltzell and Philip Baltzell to recover damages for the nondelivery of a certain cargo.]

J. Meredith, for plaintiffs.

J. Glenn and R. Johnson, for defendants.

TANEY, Circuit Justice. This action is brought to recover damages for the non-delivery of a cargo of copper ore, shipped in Chili, on board the brig Hope, Frederick Barkman, master, and consigned to the plaintiffs, who are merchants residing in Liverpool. The bill of lading is in the usual form, and was signed by the master on the 1st of July 1836, at Herradura de Carrisal, whereby he engaged to deliver the said cargo to the plaintiffs, at Swansea, in Wales, with the usual exception of the dangers of the seas.

It appears from the evidence, that the defendants, who reside in Baltimore, were the owners of the brig. She sailed from Baltimore, for Montevideo, on the 22d of October 1835, with a cargo of lumber, and was consigned to Carreras, Patrick & Butler, merchants of Montevideo, who were authorized to send her to any foreign port, with directions to remit the freight that might be earned to the defendants; this appears from the letter of Captain Barkman to the owners, written from Montevideo. The vessel arrived safely at Montevideo, and delivered her cargo; and the master, by the orders of the consignees, afterwards proceeded to Buenos Ayres, and signed there a charter party to Dickinson, Price & Co., by which the brig was to go round Cape Horn to Valparaiso, and to two ports in Chili, to take on board a cargo of copper ore, and then proceed to England, where the cargo was to be delivered. She sailed, accordingly, for Valparaiso, in February 1836, consigned to the charterers, and on the passage sprung a leak, which made it necessary to heave her down and make some repairs at that port; the exact amount of repairs and other expenses at Valparaiso, amounted to the sum of $3445, for which bills were drawn on the defendants, and paid by them.

After the repairs were made, the master called on Dickinson, Price & Co., and offered himself ready to proceed on the voyage, according to the charter-party; but they declined fulfilling the contract, alleging that the vessel was too old, and saying that they would have nothing to do with her. The master thereupon advertised her for charter, and after a delay of about fifteen days, succeeded in chartering her to Sewall & Patrickson, of Valparaiso, to proceed from that port to two ports in Chili, to load with copper ore for Swansea, in Wales, where the cargo was to be delivered to the plaintiffs. The cargo was taken on board pursuant to this charter, the master signed the bill of lading in the usual form, and the vessel sailed for her port of destination. In passing round Cape Horn, she was overtaken by severe weather, from which she suffered a great deal of damage in her hull and rigging, and was with difficulty kept from sinking, but succeeded in making the port of Pernambuco, where she arrived in great distress, and altogether unable to proceed on her voyage.

It does not appear that the master attempted to procure another vessel. He landed the cargo, and proceeded to make extensive repairs upon the brig. The whole cost of the repairs and expenses at that port amounted to the sum of £3150 sterling, for which sum with seventy per cent. premium, he hypothecated the ship, freight and cargo to the lender; the whole sum, including the premium, being £3780, for which a bond was executed, payable in ten days after the vessel should arrive at Swansea, in Wales. The brig proceeded to her port of destination, where she arrived safely about the middle of April, 1836. The money for which the hypothecation was given, not being paid, the lender proceeded in the admiralty court against the vessel, freight and cargo, and they were all sold by the decree of the court, no one having appeared on the part of the brig or cargo, to contest the claim of the bond-holder. The proceeds were not sufficient to pay the sum for which they were hypothecated.

It appears also that the portion of the aforesaid sum chargeable to the cargo, for the general and particular average, amounted to £642 8s. 11d., which was paid to the owners of the cargo by the underwriters; the freight amounted to £1189 5s. 1d.; the net proceeds of the cargo, sold under the bottomry, was £3396 19s. 5d.; and this suit was brought to recover from the owners of the ship the amount of the net proceeds of the cargo, after deducting the sum received from the underwriters and the freight.

The ship was charged, in the settlement of the general average, with £181 19s.; so that

the repairs put on the ship, and her expenses at Pernambuco, with which she was charged, over and above her portion of the general average, amounted to upwards of ten thousand dollars. She was bought by her owners in Baltimore, shortly before she sailed on her voyage from the port, for $4000, and she was sold under the bottomry for £600 sterling. The repairs at Pernambuco cost more than double as much as she was worth at Baltimore, before she sailed, or in England, after the repairs were put upon her.

It was admitted, that the ship was not insured, and that the owners had received nothing on account of the general average loss incurred as above stated. The ship and freight having thus been appropriated to the payment of the bottomry, and totally lost to the owners, the question raised here is, whether they are personally responsible to the owners of the cargo, for the loss sustained by them? And the first inquiry is, by what rule of law are we to measure the rights of the plaintiffs, and the liabilities of the defendants, under a contract like the one now sued on?

The plaintiffs insist that we must be governed by the rules of the common law; that the defendants, under the charter-party and bill of lading, were common carriers for hire, and as such were liable for any loss of the cargo, unless it happened by the act of God, or a public enemy, provided it did not fall within the exception of the dangers of the seas. But there is no sound reason for applying to this case the principles of the common law in relation to common carriers for hire. In the first place, the master, according to the doctrines of the common law, was not authorized to bind even the brig or her value, by a contract like this. In all of the cases (with the exception of that of Boucher v. Lawson. Lee t. Hardwicke, 194), in which the owner was held responsible as a common carrier, upon contracts made by the master, it appeared that the master was entrusted by the owner, not only to navigate the vessel, but also to make contracts for her employment, or to receive goods for certain ports at the customary freight. Without examining them all separately, it is sufficient to remark, that in the case of Ellis v. Turner, which is comparatively a late one (8 Term R. 531), in order to charge the owner, evidence was offered to show that it was not usual for the master to confer previously with the owners, as to the terms on which he was to take goods on board, he having a general authority or discretion to receive and convey goods for the customary freight between the ports there mentioned. And in the case of Boucher v. Lawson, above referred to, in which the court said that the owner would have been liable for the doubloons taken on board at Lisbon, to be carried to London, if it had appeared that the ship was employed in carrying goods for hire, Lord Hardwicke evidently meant that the owner would have been responsible,

if it had appeared that he had given him authority so to employ her and to make such contracts. For the court decided against the liability of the owner, although the contract for the freight was made by the master, upon the ground, that it did not appear that the ship was employed in carrying goods for hire, and for aught that appeared, might have been sent to Lisbon for a special purpose. The office of master, therefore, was not, in that case, supposed to be sufficient authority, of itself, to enable him to bind the owner by a charter-party or a contract of affreightment: and upon that point it does not differ from the case of Ellis v. Turner, before cited, and the other cases upon the same subject. They all agree that in order to render the owner answerable for cargo lost, it is not sufficient to show that the contract for transporting it was made by the master; but the party claiming remuneration must go further, and show that the owner had given authority to the master to make such a contract. His appointment as master, does not, of itself, upon the principles of the common law, confer the authority.

In this case, the brig was consigned to Carreras. Patrick & Butler, at Montevideo, with directions to employ her, if they thought it proper to do so, in a voyage to some other foreign port; and they were instructed, if they did so employ her, to consign her to their friends, and to remit the freight, if any was earned, to the owners at Baltimore. It is in proof, therefore, that no authority was given, or intended to be given, by the owners, to the master, to charter the brig, nor to receive any goods or freight, except under the direction of the consignees or their agents: on the contrary, he was carefully excluded from all such authority by the owners, and confined to the duty of navigating the vessel, as master, upon the voyages determined upon by the proper agents. When Dickinson, Price & Co.' refused to execute the contract made with the consignees, it was the duty of the master to notify them of what had happened, and to wait their orders; he had no right, according to the rules of the common law, in relation to principal and agent, or master and servant, to enter into the contract under which the voyage in question was performed; it was not within the scope of the authority conferred on him, and was not binding on the owners or their friends.

But assuming this contract to be obligatory upon the owners, upon common law principles, is there any ground for measuring the extent of their liability by its rules, founded on the ancient customs of England? The contract was made in Chili; the cargo was laden there; it was to be transported on the high seas to England, where it was to be delivered. Now, there can be no pretence for saying, that the principles of the common law, in relation to carriers for hire, prevail in Chili; and it is equally certain, that, upon a contract of this description, these ancient

rules are no longer the law of England. Since the statute of 53 Geo. III., it does not bind the owners beyond the value of the ship and freight. The words of the statute are abundantly plain; and the cases of Wilson v. Dickson, 2 Barn. & Ald. 2, and Cannan v. Meaburn, 1 Bing. 465, show how that statute has been expounded and applied in the common law courts. If the master had sold the whole of this cargo at Pernambuco, instead of hypothecating it, the owners would not have been answerable beyond the value of the ship and freight. In the country, therefore, where the contract was made, and in the country where it was to be finally executed, the rights and obligations of the parties did not depend upon the doctrines of the common law, in relation to carriers for hire. Upon what ground, then, can the court apply them here?

The ancient common law, in relation to carriers for hire, is, undoubtedly, in force in Maryland; but there is no principle of jurisprudence upon which the court can expound this contract by the laws of this state. It was not made here; and no part of it was to be performed within our territory. The shipowners, it is true, reside here; but the law of the domicil of the party does not govern the contract, nor determine his rights or obligations; they depend upon the law of the place where it was made, or where it was to be executed. In this case, the law of neither the one nor the other furnishes any ground for charging these defendants, according to the rules of the common law, in relation to carriers for hire; that law, therefore, cannot give the rule by which this court should decide the rights of the parties.

Undoubtedly, the master had a right to make this contract, under the circumstances in which he was placed, and the owners were bound by it; but this right is derived from the maritime code, which is founded in the general usages and convenience of trade, and which has been adopted, to a certain extent, by all commercial nations. The bill of lading (the contract on which this suit is brought) is an instrument founded on the usages of trade, and not connected with any of the peculiar doctrines of the common law. We must look, therefore, to the maritime code, as acknowledged and administered in this country, in order to expound this contract, and to determine the extent of the obligations it imposed upon the owners.

It is stated in Abb. Shipp. (Story's Ed. 1829), 90–93, that a charter-party, made by a master in a foreign port, in the usual course of the ship's employment, and under circumstances which do not afford evidence of fraud, binds the ship and freight; and therefore, to the amount of the value of the ship and freight, the owners are, by the maritime law, bound to the performance; and the same doctrine is laid down in 3 Kent. Comm. (3d Ed.) 162. At the time then that the vessel sailed for Swansea, where the ore had to be delivered, the ship and freight were bound for the performance of the contract into which the master had entered. It is not suggested, that anything happened before the arrival of the vessel at Pernambuco, which would render either the ship, or freight, or owners, answerable for the loss sustained by the cargo. The damage sustained in the voyage round Cape Horn was occasioned by the dangers of the seas, which made it necessary, for the safety and interest of all concerned, that the vessel should put into Pernambuco; and if the ship-owners are responsible for the cargo, their liability must arise from something that was done by the master at this port. Upon the arrival at Pernambuco, it was found, that the vessel was damaged to such an extent, that she was unable to proceed on her voyage, and the cargo was landed; under these circumstances, from the necessity of the case, the master became the agent for the cargo as well as the ship, and in that character, it was his duty to deal with the cargo as a prudent and discreet owner would have done, if he had been on the spot at the time. He might transship it, and earn freight for his owners. If his own ship could be repaired in a reasonable time, he had a right to retain it until his ship was ready; and, if necessary, might sell a part of the cargo, or hypothecate the whole, in order to obtain money for the necessary expenses of repairs; or he might abandon the voyage, and notify the owners of the cargo of the disaster which had happened, and await their orders as to its future disposition—so far as to his power over the cargo.

Now as to the ship—upon this point, the law has been laid down by the supreme court, in the case of The Aurora, 1 Wheat. [14 U. S.] 102, 106, and it is unnecessary, therefore, to multiply cases upon the subject. The master may, in a foreign port, contract for repairs and supplies, and thereby bind the owners to the value of the ship and freight, or he may hypothecate the ship and freight, and thereby create a direct lien upon them for the security of the creditors. But the authority of the master is limited to objects connected with the voyage, and if he transcends the prescribed limits, his acts become, in legal contemplation, mere nullities; and it is incumbent on the creditor to prove the actual existence of the necessity of those things which give rise to the demand. In the case of The Virgin, 8 Pet. [33 U. S.] 538, it was held, that the master could not pledge the personal credit of the owners, at the same time that he gave a bottomry on the ship; that if the bottomry-bond contained a clause to that effect, it would be void, and the owners be personally bound only to the extent of the pledged fund which actually came to their hands.

In the case before us, then, the master had a right to pledge the ship and freight, in which case, the owners are answerable no further than the amount of the pledged fund

which comes to their hands; or he might have pledged the personal responsibility of the owners to the value of the ship and freight, in which case, if the ship had been lost on the voyage, they would have been responsible to that amount.

This is the extent of the authority which the law gives to the master, in a foreign port, and if he exceeds it, his acts are void. If, therefore, in this case, the master had pledged to the bottomry-lender, the personal responsibility of the owners, to the value of the ship and freight, and cargo also, the pledge, as respects the value of the cargo, would have been void, and without lawful authority, and the owners not responsible. Can he then, by pledging to the bottomry-lender the cargo, enlarge his authority in relation to the personal responsibility of the ship-owner, and indirectly bind him, not only for the value of the ship and freight, but for the value of the cargo also? The limitations upon the power of the master so carefully stated by the supreme court, are utterly nugatory, if by this circuitous mode, he is permitted to do what he cannot do directly; and by hypothecating the cargo, exercise a power over the fortunes of his owners to an unlimited extent. We think it cannot be done; and that the value of the ship and freight only were bound, so far as the ship-owners were concerned; and as no part of that fund has come to their hands, they are not personally responsible, either directly or indirectly, for the repairs at Pernambuco.

We are not aware of any decision in England or in this country, upon the precise point now before the court. But in the case of The Gratitudine, 3 C. Rob. Adm. 257, Lord Stowell strongly intimates an opinion that, in a case like this, the ship-owner would not be responsible to the owner of the cargo; and in The Packet [Case No. 10,654], it appears, from the language of the court, that Judge Story also doubted the liability of the ship-owner.

The justice and sound policy of the rule which restricts the power of the master over the property and fortune of his owner, to the value of the ship intrusted to his command and the freight she may earn, is proved by its deliberate adoption by every commercial nation in Europe; and we should be very unwilling to establish a contrary principle in this country, unless very clear and decisive authorities compelled us to the decision. For it would place the American ship-owner in a far worse condition than his European rival, and compel him to hazard his whole fortune, however large, upon every distant voyage made by one of his ships. And as the evil could be cured only by the legislation of the states, different rules would perhaps be established in different places, and the mischief to commerce increased by conflicting laws in the several states.

The principles stated by Lord Hardwicke, in the case of Boucher v. Lawson, in relation to the liability of the owner, although restricted to much narrower limits than those now contended for, appear to have surprised the commercial community of Great Britain, since they immediately petitioned for, and obtained an act of parliament limiting the responsibility of the owner, in cases like that of Boucher v. Lawson, to the value of the ship and freight. And when it appeared, from the decision of the court of king's bench in the subsequent case of Sutton v. Mitchell, 1 Term R. 18, that the former act of parliament did not cover all cases of the loss of cargo, the ship-owners immediately petitioned for, and procured the passage of an act extending the restriction to other cases; and finally obtained the law 53 Geo. III. c. 159, which, in every case of loss of cargo, without the fault of the owner, limits his liability to the value of the ship and freight. Abb. Shipp. (Story's Ed. 1829) 264–268. The history of these acts of parliament, shows that in the two decisions above mentioned, the principles adopted by the court carried the responsibility of the ship-owner, in England, farther than it had been supposed to extend in the commercial world; and the limitations procured immediately afterwards by act of parliament, show the apprehensions which these decisions excited, and the general sense of the trading community, that the liability should have been restricted to the value of the ship and freight. We are satisfied that, at this day, this is the general understanding of those who are engaged in commerce, and that the contracts are always made by both parties under that impression; and there can be no necessity or propriety in pushing the liability beyond the bounds prescribed by the general usages and understanding of the commercial world.

There is another view of this case, in which it appears to be evidently unjust and inequitable for the plaintiffs, to charge these defendants for the loss of the cargo. The master has the power to pledge the ship and freight only in cases of necessity, that is to say, where it is necessary for the interest of the owner; or there is reasonable ground to believe it to be for his interest; and the lender on bottomry is bound to show the existence of this necessity, otherwise, he is not entitled to recover, even against the ship and freight. Now, it never can be necessary for the interest of the owner of the ship to place upon her repairs, which cost more than double the amount of what she is worth after the repairs are made. There may be cases in which it may be for the interest of the owner of the cargo to do so; because the cargo may be of great value at the port of destination, and of little or no value at the port of necessity; it may be perishable in its nature; it may appear to have been impossible to procure another vessel in time to save it; and it may be the interest of the owner of the cargo to have repairs made upon the ship far beyond her value, in order

to enable her to transport his property to its place of destination. If there was any necessity which could have justified the enormous expenditure for repairs in this case, it must have been the necessities of the cargo, and not of the brig; for the repairs unavoidably sacrificed the vessel and freight, and nothing could be gained by them except for the cargo.

It is because it may sometimes be for the interest of the cargo to have the vessel repaired, that the power is given to the master to sell a part, or hypothecate the whole, if necessary, in order to raise funds for that purpose. But his power over the cargo is like his power over the ship in this respect; the lender must show that the necessity existed, otherwise he is not entitled to recover on his bond. Abb. Shipp. (Story's Ed. 1829) 129; 3 Kent, Comm. (1st Ed.) 133. Now in this case, although the cargo was not perishable, and although it does not appear that it could not.have been transshipped at the same freight, and although the hypothecation has resulted most disastrously to the cargo as well as to the ship; yet, at Pernambuco, where the cargo must have been of very little value, and where very high calculations may have been formed of its value at Swansea, it may have been supposed that the interest of the owner of the cargo required that these extensive repairs should be made, in order to transport it to its port of destination.

If a discreet and prudent man, placed in the situation of the master, would have supposed so, then the hypothecation was lawful, and within the scope of his authority. Bad faith in this transaction is not imputed to him on either side; if he acted in good faith, and the interests of the cargo justified him in hypothecating the whole of it, there can be no good reason for charging the ship-owner with the unfortunate results of the contract made for the benefit of the owner of the cargo; but if, on the other hand, the interests of the cargo did not authorize the hypothecation, then the lender of the money obtained no lien upon it, since it was his duty to see that the necessity existed before he lent his money, and he was bound to prove its existence, if required to do so, to the satisfaction of the court, before he could enforce his· lien. It appears from the evidence in this case, that the present plaintiffs stood by and saw the whole cargo sold, without appearing in the admiralty court to defend it, and without ·requiring from the lender any proof whatever of the· necessity of the case. In either alternative, therefore, whether the necessity did or did not exist, it would be unreasonable and unjust to charge the ship-owner with the loss of the cargo arising from the hypothecation at Pernambuco; if justifiable, it was made for the benefit of the cargo, and at the sacrifice of the interests of the ship-owner; if not justifiable, it was lost by the negligence of the plaintiffs, to whom it was consigned, and who took no measures to protect it.

It is, perhaps, hardly necessary to remark particularly upon the opinion expressed by Mr. Benecke in his book on Average (page 253), that the ship-owner is personally liable for the value of the cargo in a case like the present. It is his inference from the various cases which have been cited in the present argument, and he refers to no case in which the point has been decided, nor even suggested that there is any established . usage at Lloyd's upon this subject.

Upon the whole, we think that the master in this case had no right to pledge the ship-owner beyond the value of the ship and freight, and that the plaintiffs, therefore, are not entitled to recover.